The judgment of the United States Customs Court is *reversed*.

UNITED STATES *v.* E. E. HOLLER (No. 4250) [1]

[1] C. A. D. 132.

United States Court of Customs and Patent Appeals, June 24, 1940

*Webster J. Oliver*, Assistant Attorney General (*Samuel D. Spector*, special attorney, of counsel), for the United States.

*Lawrence A. Harper* (*Abraham Gottfried* of counsel) for appellee.

[Oral argument February 5, 1940, by Mr. Spector and Mr. Gottfried]

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, LENROOT, and JACKSON, Associate Judges

GARRETT, Presiding Judge, delivered the opinion of the court:

This is an appeal from the judgment of the United States Customs Court, Third Division, one judge dissenting, sustaining protests of the importer whereby he seeks recovery of certain moneys assessed and

collected as duties upon importations of fresh fish brought into the United States from Mexico. Thirteen protests are involved, the cases having been consolidated for trial, and it was stipulated that the testimony taken should be applicable to all the protests. A companion case was argued in connection with this case and is decided concurrently. *United States* v. *Holler*, 28 C. C. P. A. (Customs) 124, C. A. D. 133. Factual differences, however, require that the cases be separately considered.

The merchandise was imported on various dates ranging from May 26, 1937 to September 15, 1937, entries being made at Nogales, Ariz. The importations were by truck. The collector classified the merchandise under paragraph 717 (a) of the Tariff Act of 1930, which reads:

PAR. 717. (a) Fish, fresh or frozen (whether or not packed in ice), whole, or beheaded or eviscerated or both, but not further advanced (except that the fins may be removed): Halibut, salmon, mackerel, and swordfish, 2 cents per pound; other fish, not specially provided for, 1 cent per pound.

In the protests importer claimed free entry under paragraph 1730 (a) of the act, which reads:

PAR. 1730. (a) All products of American fisheries (including fish, shellfish, and other marine animals, and spermaceti, whale, fish, and other marine animal oils), which have not been landed in a foreign country or which, if so landed, have been landed solely for transshipment without change in condition: *Provided*, That fish the product of American fisheries (except cod, haddock, hake, pollock, cusk, mackerel, and swordfish) landed in a foreign country and there not further advanced than beheaded, eviscerated, packed in ice, frozen, and with fins removed, shall be exempt from duty: *Provided further*, That products of American fisheries, prepared or preserved by an American fishery, on the treaty coasts of Newfoundland, Magdalen Islands, and Labrador, as such coasts are defined in the Convention of 1818 between the United States and Great Britain, shall be exempt from duty.

The following excerpts from article 489 of the Customs Regulations of 1937 are pertinent:

(c) American fishery within the meaning of said paragraph is defined as a fishery operated under the American flag by American vessels in foreign waters, in which such vessels have the right, by treaty or otherwise, to take fish and other marine products.

(d) The employment of foreign fishermen either as members of the crew or under the supervision of the master or crew of an American vessel is allowed. The purchase by the owner, agent, master, or crew of an American vessel of fish or other marine products taken by the citizens of another country in foreign waters will subject such fish or other marine products to treatment as foreign merchandise.

In the report of the collector transmitting the papers to the Customs Court, under the heading of "Reasons and Authority for Action," the collector stated:

The fresh fish covered by these protests were entered as the products of American Fisheries but were liquidated dutiable on the basis of a report of investigation

made by customs agents at the sites of fishing operations, which was to the effect that under Mexican laws fish can only be taken from Mexican waters by purchase from Mexican fishing societies.

At the beginning of the trial, counsel for importer stated:

We propose to show in this case, if your Honor please, that these fish are caught by an American vessel, operating under the American flag, in the Gulf of California, owned by an American citizen; that an American citizen as master supervised the catching of the fish in question; that the fish when caught were landed in Mexico, and then transported to the United States in trucks, owned by the owner of the boat and merchandise; that the fish never entered the commerce of Mexico, and were not further advanced than beheaded, eviscerated, packed in ice, with the fins removed.

We thus have the general issue outlined.

At the threshold a question to be determined is whether the fish at issue were a product of American fisheries in the sense of paragraph 1730, *supra*, and customs regulations, *supra*. In short, it is necessary to determine whether the vessel used was an American vessel. Unhappily, the evidence respecting this question is not wholly satisfactory. It may be said that the actual importer of the merchandise appears to have been a company known as the Sonora Fish Co., which was owned by an individual by the name of David B. Almond, the place of business being Tucson, Ariz. Almond was called as a witness in the case and a part of his testimony consisted of the following:

Q. Where was this fish from?—A. From Kino Bay, Sonora, Mexico.

Q. Is Kino Bay on the Gulf of Lower California?—A. It is on the east side of the Gulf of California, or on the west coast of the Mexican mainland proper.

Q. The mainland is Mexico?—A. Yes, sir.

Q. Do you own a boat named the *Mabel*?—A. Yes, sir.

Q. Where was this boat located at the time of this entry?—A. At Kino Bay.

Q. Was the *Mabel*, at the time the fish covered by this entry were caught, an American vessel?—A. Yes, sir; documented at San Pedro. We bought it out there a year or so previous to that time.

Q. Have you been the owner of that boat up to the present time?—A. Yes, sir.

Q. And have the documents on the vessel remained the same all of that time?—A. Yes, sir.

Q. Are you a citizen of the United States?—A. Yes, sir.

Q. For how long have you been such?—A. All of my life—56 years.

Q. Where were you born?—A. Kingman, Kansas.

\*       \*       \*       \*       \*       \*       \*

Q. Will you please state the approximate specifications of that boat referred to as the *Mabel*.—A. I think it is about 50 feet long, and about 11½ feet wide.

Q. What motor power does it have?—A. Three cylinder, 35 horsepower. I don't know the name of the engine now.

Q. Is it a gas engine?—A. It has a gas engine.

Q. Who is the master of the *Mabel*?—A. My brother.

Q. What is his name?—A. L. C. Almond.

Q. Is he an American citizen?—A. Yes, sir.

Q. How long has he been an American citizen?—A. About 54 years.

Judge DALLINGER. He was born in this country?

The WITNESS. Yes, sir.

\*    \*    \*    \*    \*    \*    \*

Q. Will you please state his duties in connection with his position on that boat?—A. Well, he is the captain of the boat, and runs the boat, and attends to the fishing business pertaining to the boat.

Q. Does he pay the salaries of the crew?—A. Yes, sir.

Q. Does he pay the hire, or salary, for fishermen in his hire, or do you pay for that?

\*    \*    \*    \*    \*    \*    \*

A. He pays it.

Q. He pays it personally?—A. Yes, sir.

Q. You don't have to do that?—A. No. I just send the money down there, and he pays it.

Q. Is the *Mabel* engaged in fishing solely in the Gulf of California?—A. Yes, sir.

Q. Over what period of time has that been true?—A. About three years—between three and four years.

Q. And so far as you know were the fish the subject of this protest a part of the fish caught by the *Mabel*, in fishing activities in the Gulf of California?—A. Yes, sir.

The brother, L. C. Almond, was also called as a witness and gave the following testimony bearing upon the point under discussion:

Q. Are you an American citizen?—A. All of my life.

Q. Born in——A. Kingman, Kansas.

Q. Approximately how old are you?—A. 54.

Q. Who is the owner of the *Mabel*?—A. My brother, D. B. Almond.

Q. Is he an American citizen?—A. Yes.

Q. How long has he been the owner of the boat?—A. Well, since he bought it, about three and a half years ago; more or less.

Q. And is that a boat flying the American flag, and documented in the United States?—A. Yes, sir.

Q. In what port is it documented, if you know?—A. San Pedro, California.

Q. Where, and how long has the boat been located—where is the boat located now?—A. Not now. At the particular time of this loading?

Q. Yes.—A. In Kino Bay.

Q. How long was it operating in Kino Bay prior to this particular loading?—A. Well, about——

Q. Approximately?—A. A year and a half.

Q. And Kino Bay is on the Gulf of California; is that correct?—A. Yes, sir.

Q. On the mainland side of the country of Mexico?—A. Yes, sir.

It may be said at this point that all the testimony in the case was taken in the latter part of January 1938. Obviously, the foregoing testimony is in the nature of secondary evidence. The best evidence would have been a proper certificate of the official documentation, but the above testimony was not objected to on the ground that it was not the best evidence. It is true that after David B. Almond had answered a number of questions and before his testimony above quoted was given, counsel for the Government interrupted his examination and moved to strike out all the evidence that he had given up to that time, stating that the motion was "on the ground that there is no personal knowledge that the merchandise purchased and imported

was the merchandise delivered. His knowledge is based completely on hearsay, and on reports of other persons. I don't think that in the best evidence."

The testimony which it was so moved to strike had no relation to the documentation of the vessel, but it is also true that after the importer's testimony had been concluded, and just before the presentation of testimony on behalf of the Government, the following occurred:

Mr. SPECTOR. At this time I move to strike out the testimony of D. B. Almond, on the ground that the evidence adduced through him was not connected with the relevant and pertinent issue. All of this extraneous matter was allowed to go in subject to connection. I feel that the said testimony was not properly connected.

Judge DALLINGER. I think some of his testimony is perfectly relevant. He testified that he was the owner of the boat.

Mr. SPECTOR. I will modify my motion—to those parts which were objected to, and the subsequent testimony.

Judge DALLINGER. The Government's motion will be taken under advisement. When the record is written up the court will be able to decide that.

Mr. GOTTFRIED. Is ruling reserved for the Division?

Judge DALLINGER. Yes.

The meaning of the last foregoing motion would seem to be that Government counsel was seeking to have the entire testimony of David B. Almond stricken from the record, which would, of course, have included that referring to the documentation of the vessel, but, as has been stated, that particular testimony was never specifically objected to or pointed out as being objectionable by Government counsel. We agree with the judge before whom the testimony was taken and with the division which tried the case, that much of the testimony of David B. Almond was relevant and proper, and the Government's assignment of error as to the action of the court in refusing to strike it is overruled. The practice of making blanket objection without specifying any particular testimony is a practice which should not be encouraged. Both the opposing party and the court are entitled to know the position of counsel respecting the admissibility of particular testimony, and we hold that upon the state of the record the testimony of David B. Almond, above quoted, is proper to be considered. There was no objection to the testimony of L. C. Almond upon this point, nor was there any motion to strike it. We, of course, have given no weight to such of the evidence as was irrelevant and immaterial.

It is urged by the Government (of course, in the light of its insistence that the testimony of David B. Almond should be stricken) that there is no evidence in the record to sustain the contention that the vessel *Mabel* was operating under the American flag at the time the fish were caught, and the Government introduced in evidence, as Collective Exhibit 2, a paper which it claims establishes Mexican

registry of the vessel in the name of an organization entitled "Cooperative Fishing Company 'Lazaro Cardenas' " (a term to which reference will be made later).

The original paper referred to is in Spanish, but a purported English translation was presented in evidence, which reads as follows:

OFFICIAL RECEIPT

Hermosillo, Son., *March 17, 1937.*

For $20.00—Receipt authorized by the Government of the United Mexican States for Cooperative Fishing Company "Lazaro Cardenas". The sum of $20.00. Twenty pesos no/100. For account of taxes and exploitation of National products XIII–G Fishing and diving: Registry fee for the boat *Mabel*, capacity 11.85 tons, in accordance with Sec. 82 of the Fishing Tariff in effect.

The Official Seal. The Second Official in Charge of Cashier's Office:

Pedro Moreno,
*Complete name of signer.*
Agreed: Interested Party.

A true certified copy:
HERMOSILLO, SON., *January 19, 1938.*
The Chief Clerk:

FRANCISCO TELLEZ ARAIZA.

The reference to section 82 of the fishing act obviously relates to some Mexican law which is not a part of the record before us.

In its brief, the Government refers to the above paper as a copy of the registration in connection with its claim that the vessel was not under American registry. We are somewhat surprised that the paper should be so designated. Obviously, it is not a copy of any registration, but merely a receipt for money. It is difficult to tell just what authority issued this receipt, and there is no explanation in the record which helps in that regard. The translator of the original document stated in his testimony, in substance, that he had been an interpreter of Spanish for 12 years, and that literal translation of the Spanish language into exact English was not easily made. The document was introduced in evidence as Exhibit 2 and is so referred to at different places in the record. In the cross-examination of L. C. Almond we find the following testimony:

X Q. What is this paper [showing paper to witness]?—A. This here is a Federal fishing permit—a general fishing permit to fish.

X Q. Wasn't that given to your boat?—A. Yes, sir.

X Q. Who paid the fee on this?—A. I turned the money in by the truck driver, and he makes the application, and put it in the Cooperativa's name for convenience. I am a member of the Cooperativa.

X Q. Was it for convenience or necessity?—A. It is a necessity to have a permit, but not to have it in the name—in your name. They used to get it in my name. After I joined the Cooperativa I had it in the Cooperativa's name.

X Q. Does the Mexican Government issue a permit to you?—A. They used to. For the time we made application for it they did.

X Q. When was that?—A. I don't remember.

X Q. Was that before the Cooperativa came into existence?—A. No.

X Q. Was it before the Mexican law permitted only Cooperativas to fish in the Gulf of California?—A. I don't know what time they made that regulation, but it has been several years.

As we view it, the instrument merely indicates that the money was paid for taxes and privileges including a permit for fishing and for the use of the boat in such fishing. It is true that it recites "Registry fee for the boat *Mabel*," etc., but, as we view it, no deduction should be drawn that this represented a documentation of the vessel as a Mexican vessel. L. C. Almond's explanation of it as a fishing license would seem to be quite reasonable, in view of the text of the document. It seems perfectly clear to us that the importer here made out a *prima facie* case showing this to be a vessel documented in the United States at the time the fish in issue were taken and the Government has failed to overcome such *prima facie* case by any substantial evidence.

The second question in the case is whether the fish were products of American fisheries, the vessel being treated as an American vessel in the sense of the statute and article 489 (c) of the Customs Regulations, *supra*.

It appears that the fish, consisting of fresh cabrilla and pinta, were caught in Kino Bay, a part of the Gulf of California, and beyond the 3-mile shore line of Mexico, by fishermen fishing from the deck of the boat *Mabel* under the supervision of its captain, L. C. Almond. The boat had a regular crew consisting of an engineer and two deck hands, all the crew being Mexicans. It further appears that in the vicinity where the fish were caught there is an organization (Cooperativa Fishing Co., Lazaro Cardenas), composed of fishermen, generally referred to throughout the record as "Cooperativa," the organization being under Mexican law. At the time of the fishing here under consideration both natives and foreigners were eligible to be admitted in the organization as "associates," and L. C. Almond appears to have had such status. The precise nature of the organization is not made clear by the record. Appellee seems to regard it as being something in the nature of a labor union while the Government says that it was not a union but a "cooperative association of independent fishermen who were engaged in fishing in Kino Bay," and who combined to act as a united group. The arguments respecting this are not based upon any evidence in the record as to the nature of the organization, because there is none. The views expressed by counsel for both parties are apparently merely their interpretations of certain laws or decrees hereinafter alluded to. In the view which we take of the case, the exact nature of the organization is not of importance here, but further allusion to it will be made. It appears in the instant case that the organization supplied extra fishermen upon the application of the master of the *Mabel*, who fished from the boat under his supervision (as was authorized by article 489 (*d*) of the

Customs Regulations, *supra,*) and who were paid for their labor at a certain price per kilo of fish caught, as agreed upon between the individual fishermen and the master of the vessel. It was a condition that the master so employing extra fishermen was obliged to take all the fish which they caught. It may be added that in the particular instances here involved it appears that the regular crew of the *Mabel,* and sometimes the master also, fished, and the crew were paid for the fish they caught, such payment being in addition to the pay by the day for their labor upon the boat. The price paid the latter for fishing seems to have been less per kilo than that paid the specially employed fishermen. It is shown that the master of the *Mabel* kept the fish caught by himself and crew separate from those caught by the specially employed fishermen, and that, in some instances, he paid to the Cooperativa what were designated as dues, amounting to 1 centavo per kilo of the fish caught. It is shown that when the master of the vessel decided to employ fishermen he notified someone of the cooperative organization and was supplied with such aids as he might require. It further appears that the fish, after being taken, were landed on the shore of the bay from the boat *Mabel* and there dressed in the manner permitted by the United States statute, after which they were weighed (frequently in the presence of the fishermen who took them) on scales belonging to the Sonora Fish Co., and then loaded into a truck owned by the importer, David B. Almond, and transported to Tucson, passing through the port at Nogales, Ariz. The fishermen were paid by L. C. Almond, the master of the vessel. It was the practice of D. B. Almond to send the money for these payments by the driver of the truck, whose testimony is in the record. The driver received his own expenses and salary out of the moneys so paid him, and he paid over to L. C. Almond the amounts required to pay the fishermen.

The Government's case may be said to rest upon its construction of a Mexican law, in the form of a decree issued by the President of Mexico in February 1930, for the avowed purpose of guaranteeing "the means of livelihood and the improvement of the laboring classes of the coasts of the Gulf of California whose habitual occupation is that of fishing in the waters of that zone," the original decree and a translation of same being introduced in evidence as Collective Exhibit No. 4. The pertinent portions of the translation of this decree read as follows:

WHEREAS: It is the obligation of the Federal Government to prevent possible disadvantageous competition on the part of foreign enterprises for our native fishermen, specifying those waters which should be reserved for the exclusive use of the aforesaid fishermen, thus presenting a united front to foreign buyers who wish to control and to set prices on the national fishing products with serious damage to the interests of the collectivity and of the Government itself: based

on Article 1, section II; Transitory Article 1 of the Law of Fishing, and Section I of Article 89 of the Constitution, I have seen fit to issue the following

DECREE

Article 1.—The fishing zone north from Parallel 27 in the Gulf of California is declared to be a zone of common exploitation, devoted to the exclusive use of the regional fishermen.

Article 2.—There is reserved, for the benefit of the exploitations authorized in the zone specified by the foregoing Article, the. fishing of *totoaba*, *curbina*, and *cabrilla*.

Article 3.—The exploitation of the zone specified in Article 1 shall be subject to the following requirements:

I.—It may only be ceded to the Cooperative Society of Fishermen which is organized by the regional fishermen; on the understanding that in that Cooperative there shall be admitted as associates anyone who wishes to join, natives and foreigners, provided that they deliver their entire production to the Cooperative for the sale thereof either for internal consumption within the Republic or for exportation, through the agency of the Cooperative.

There is also in the record a translation of another decree of the President of Mexico, introduced as Exhibit 5, issued in October or November 1933, which amended the above-quoted decree in certain respects. The amendment so made was not of a character which affects the issue here.

Whether the decree in question has ever been construed by any official authority of Mexico, administrative or judicial, does not appear, nor was any evidence of Mexican lawyers introduced respecting its construction as is permissible and as frequently happens in the case of foreign laws. The Government construes article 3, paragraph I, as above quoted, to mean that all fish caught by associates of the Cooperativa, whether natives or foreigners, are, in legal effect, sold to and become the property of Cooperativa for the sale thereof, either for internal consumption or for exportation. In other words, it is the position of the Government that all the involved fish became the property of Cooperativa, as a legal result of the terms of the decree, and hence were not the product of American fisheries in the sense of the statute and regulations.

The Government also introduced in evidence as Exhibit 1 what is designated in the original paper as a *factura*, which word was translated by the interpreter as "invoice." The English translation of it, also introduced in evidence, reads as follows:

Invoice No. 277 P

Folio No. 177
Kino Bay, Sonora, Mex. July 9 1937

Mr. Sonora Fish Co;
    Tucson, Arizona.
TO: COOPERATIVA FISHING COMPANY OF KINO BAY "LAZARO CARDENAS"
                                                    S. C. L.        Dr.
For the following purchased for cash:
    1147 Kilos CABRILLAS fresh at $0.25 per kilo         $286. 75
    1140   "    Pintas fresh at $0.23           "    "      262. 20
                                                        ──────────
    Total:                                               $548. 95
Five Hundred Forty eight pesos 95/100
        Subject to error or omission.
For the Cooperative Fishing Company of Kino Bay "Lazaro Cardenas"
                                            S. C. L.
                                                    Sgo.
                                            (Sgd) / Rojas Mgr.
Without stamps under frank established by Decree of May 4, 1936.

In the testimony of Almond's truck driver, a man by the name of Raul Garcia, it was stated, in substance, that this instrument was required to get the merchandise across from Mexico into the United States, he being so informed by the broker on the Mexican side. He stated that it was prepared by the manager of the Cooperativa upon information supplied by him (Garcia) and that there was no charge for the same. It is argued by the Government that this paper is proof of the fact that the merchandise was the property of the Cooperativa who billed it to Sonora Fish Co.

We understand it to be the position of the Government that the fish became the property of the Cooperativa, by virtue of the Mexican decree, the instant they were taken from the water.

We are unable to agree with this view.

In the first place, it may be said that the uncontradicted evidence in the record is that the fish were caught more than 3 miles from the Mexican shore line, that is they were caught in waters which, so far as the record shows, were open to exploitation by U. S. A. fishermen, free from Mexican control. It cannot be doubted that being so caught no title could have been claimed to the fish by the Cooperativa had they been transported to the United States without having been landed in Mexico.

We think the same rule as to title would apply to fish caught within waters under Mexican control so long as they were caught by permission of the Mexican Government. So far as title was concerned, assuming that to be involved, the decree had no effect at least until the fish were landed. So, we dismiss without further comment the contention that title passed to the Cooperative Society the instant the fish were taken from the waters, and proceed to the consideration of their status as the result of their being landed. This involves con-

sideration of the phrase in paragraph 1730 (a) *supra*, reading "landed solely for transshipment without change in condition," but first some comment upon the Mexican decree seems pertinent.

The translation of this decree appearing in the record does not seem to us to be free from ambiguity, but apparently it presupposed the existence, or authorized the formation, of an organization described as the Cooperative Society of Fishermen and provided that exploitation of a particular zone in the Gulf of California should be ceded to that organization on the understanding that it should admit as "associates" any persons, "natives and foreigners," with the *proviso* or condition that such associates should "deliver their entire production" to the Cooperative Society through the agency of which such production should be either sold within Mexico or exported from Mexico. The translation of the decree says nothing of title to this fish passing from those who catch them, or have them caught, nor is there any phrase which states that they are, in legal effect, regarded as being *sold* or that they, in fact, must be *sold* to the Cooperative Society. The pertinent language of the decree is, "provided that they [the associates] deliver their entire production to the Cooperative for the sale thereof either for internal consumption within the Republic or for exportation, through the agency of the Cooperative."

We think it might be argued forcefully from the translation of the text of the Mexican decree alone that the Cooperative Society of Fishermen under discussion was simply the agent for those admitted as associates, and that the "factura," or invoice, above quoted, when considered in the light of the decree is not conclusive proof of actual ownership of the fish by the Society, but is consistent with the idea of agency.

However, the Mexican law may have a different meaning and we are reluctant to make a ruling construing a law of a foreign country in the absence of any construction of it by official tribunals, or, at least by legal experts, of that country. We refrain from so doing here.

We think the controversy must be determined adverse to the Government upon a proper construction of our own laws.

It will be observed that paragraph 1730 (a) provides that all products of American fisheries which have not been landed in a foreign country, or, if so landed, have been landed solely for transshipment without change of condition, shall be exempt from duty, coupled with a *proviso* that fish other than cod, haddock, hake, pollock, cusk, mackerel, and swordfish, landed in a foreign country, shall be exempt from duty if not further advanced than beheaded, eviscerated, packed in ice, frozen, and with fins removed. It will be observed also that the *proviso* contains the phrase "landed in a foreign country," while the first part of the paragraph contains the phrase "have been landed

solely for transshipment without change of condition." It seems clear that Congress did not intend to import into the *proviso* the words "landed solely for transshipment without change of condition," other than beheaded, etc. If that had been the intent of Congress it doubtless would have been so expressed. It will be further observed that the changes in condition enumerated in the *proviso* are the same as those enumerated in paragraph 717 (a) which provides for a duty on fish. In view of the foregoing, we are of the opinion that Congress, by the enactment of paragraph 1730 (a), intended that cod, haddock, hake, pollock, cusk, mackerel, and swordfish, the product of American fisheries, should be exempt from duty if landed in a foreign country solely for transshipment without change in condition, but all other fish, the product of American fisheries, landed in a foreign country, and not further advanced than is specified by the *proviso*, should be exempt from duty, at least when imported by the party who caught them (or on whose account they were caught) and landed them, even though not landed solely for transshipment. In other words, in order to encourage the growth of American fisheries, Congress intended that fish, the product of such fisheries, other than those named in the *proviso*, should be exempt from duty provided only that they were not further advanced than is specified in the *proviso*.

It appears from the Summary of Tariff Information 1929, page 2471, that the attention of Congress was called to our decision in the case of *New England Fish Co.* v. *United States*, 15 Ct. Cust. Appls. 34, T. D. 42137, wherein it was held that fish caught by Americans in American vessels, bought by a Canadian subsidiary of an American corporation, landed, graded, packed in ice and immediately shipped in bond to the United States, were exempt from duty.

In that case we said:

Upon the question of whether the fish had lost their status as a product of American fisheries prior to importation, the appellant introduced considerable evidence. It plainly appears therefrom that the fish did not enter the commerce of Canada; that they were not sold to any Canadian company; that the fish covered by entry 750842 were purchased from the officers of an American vessel by an agent of the appellant and for its account; that those covered by entry 751272 were purchased from the officers of an American vessel by an agent of one of appellant's American branches located at Seattle, Wash., and sold to appellant; and that the fish were not advanced in condition or value after their purchase and prior to importation. They were graded, packed in ice, and immediately shipped under bond to the United States. The fact that the grading, packing, and icing were done by citizens of Canada for the appellant would not alter the character or status of the fish.

*       *       *       *       *       *       *

The fish were caught by American fisheries; they thereupon became the product of such fisheries; and, in our opinion, their status as such product was not altered by anything that thereafter occurred prior to importation.

It would seem that those provisions of paragraph 1730 (a), which appeared for the first time in the Tariff Act of 1930, were intended by Congress to prevent the application of the decision last cited to cod, haddock, hake, pollock, cusk, mackerel, and swordfish, but that all other fish, the product of American fisheries, in harmony with said decision, should be exempt from duty if not further advanced than is prescribed in the first *proviso* of the paragraph.

In the instant case we think the fish were a product of American fisheries, and that, as was said in the *New England Fish Co.* case, *supra*, "their status as such product was not altered by anything that thereafter occurred prior to importation." They were landed in Mexico, but not further advanced than is prescribed in the first *proviso* of paragraph 1730 (a), and, therefore, under said paragraph they were exempt from duty when imported into the United States. It is not intended here to go beyond the principle applied in the *New England Fish Co.* case, *supra*.

The brief on behalf of the Government filed in this case contains certain statements which justify brief comment. It is said:

The importer would have this court believe, that he was personally and openly thwarting the law of Mexico by subterfuge and intrigue, and was deliberately defrauding the Government of Mexico of taxes, duties, and assessments which it would have rightfully levied upon this merchandise, had it been the property of the Sonora Fish Company at the time of its exportation into the United States. Should the court rule that the fish are the product of American fisheries, it would definitely have put its stamp of approval upon fraud against the Government of Mexico. It would approve a conspiracy to defraud the Mexican Government out of revenue and would give judicial sanction to the alleged plan of depriving the Mexican Government of revenue, and enabling persons to flout its laws. Such a result should never be countenanced by any United States Court, because of the fundamental principle of law, that the United States courts must take judicial notice of a compliance with law rather than with an evasion thereof. The apparent willingness of the importer to thwart the laws of Mexico as indicated by the foregoing circumstances, weakens the probative value of the testimony in his behalf.

We infer from the paper entitled "Official Receipt," quoted *supra*, that the Mexican Government required the securing by the owner or master of the vessel, *Mabel*, of a license to operate in Mexican waters, paying therefor, and that the master of the *Mabel* did so. Aside from this there is not a scintilla of evidence in the record indicating that there are any "taxes, duties, and assessments" levied by that Government upon fish taken by American fisheries which pass through Mexican territory. The *factura*, or invoice, above quoted is shown to have been necessary in order to get the merchandise across the line, but there is nothing about it to indicate that "taxes, duties, and assessments" were leviable by the Mexican Government upon any fish.

So, the statement in the brief with respect to "defrauding the Government of Mexico of taxes, duties, and assessments which it would

have rightfully levied," etc., is gratuitous, and the statement respecting this court definitely putting "its stamp of approval upon fraud against the Government of Mexico" is unjustifiable. It unjustly reflects upon the trial court whose decision held the fish to be products of American fisheries. It might be remarked that the practice indulged with respect to those importations is shown to have been in vogue over a long period of time and it is not shown that the Mexican Government has ever made any complaint of it or interposed any objection to it. The Government of Mexico is presumed to be capable of protecting its own interests and enforcing its own laws, and the very fact that no activity on its part respecting the practice has been shown might be taken as evidence that that Government did not regard itself as being defrauded.

The brief on behalf of appellee treats the case from various angles, and numerous authorities are cited in support of his various contentions as to the law, but no review of them is necessary.

For the reasons herein stated, the judgment of the United States Customs Court is *affirmed*.

### DISSENTING OPINION

BLAND, Judge: In the majority opinion it is stated:

\* \* \* In other words, in order to encourage the growth of American fisheries, Congress intended that fish, the product of such fisheries, other than those named in the *proviso*, should be exempt from duty provided only that they were not further advanced than is specified in the *proviso*. ·

\*          \*          \*          \*          \*          \*          \*

In the instant case we think the fish were a product of American fisheries, and that, as was said in the *New England Fish Co.* case, *supra*, "their status as such product was not altered by anything that thereafter occurred prior to importation." They were landed in Mexico, but not further advanced than is prescribed in the first *proviso* of paragraph 1730 (a), and, therefore, under said paragraph they were exempt from duty when imported into the United States. It is not intended here to go beyond the principle applied in the *New England Fish Co.* case, *supra*.

In view of the interpretation of paragraph 1730, to which further reference will be made later, it necessarily follows, I respectfully submit, that the above-quoted language suggests that no matter what happens to fish of the character involved here after they have been landed abroad, as long as they have not been further advanced than is specified in the *proviso*, they will be free of duty. Under the majority's interpretation of the paragraph it of course naturally follows, after eliminating the language "landed solely for transshipment," as far as the instant goods are concerned, that there is but one requirement to make them free of duty, i. e., that they shall not be further advanced than "beheaded, eviscerated, packed in ice, frozen, and with fins removed." They could be sold to Mexican fish dealers or to the Mexican government and taxed and resold and imported

into the United States and still be free of duty. It seems to me that that is the natural interpretation to be given to the language used by the majority and this is not denied in the majority opinion and no language is used which saves the question for the future. We should clarify the language and make definite holdings.

Some of the majority no doubt think that the record at bar does not show that the instant merchandise was sold in Mexico and thereby entered the commerce of Mexico. On this question I must frankly state there may be reasonable doubt, although the Mexican decree involved, in plain language, requires them to be landed for sale either for domestic consumption or sale abroad and the Cooperativa gave to the American truck driver who took them to the United States a bill of sale showing the amount paid, etc.

There is no affirmative holding in the majority opinion that there was no sale in Mexico. In my judgment this is not a question that should remain unsettled and if the majority definitely held that upon the record the merchandise had been sold to other than American interests in Mexico, probably some of my associates who concur in the majority opinion would not be willing to do so. This issue should be definitely settled because for reasons which I will presently explain, some of which reasons go to the interpretation of paragraph 1730, I think it is the most important basic issue for decision here.

In the Tariff Act of 1922 there was a dutiable provision, paragraph 717, for fish. There was also, paragraph 1630, a free list provision for "all fish and other products of such [American] fisheries." In *New England Fish Co.* v. *United States*, 15 Ct. Cust. Appls. 34, T. D. 42137, this court had before it fish which were caught by American fishermen, taken from the boats in bond for shipment to America, after grading and icing, and without going into the hands of any foreigner. We held that they had not gone into the commerce of Canada; that no duties had been levied upon them by Canada, and that they were, therefore, the product of American fisheries under the language of the Tariff Act of 1922.

The Tariff Commission prepared and submitted to the Committee on Ways and Means of the House of Representatives when it was framing the paragraph involved, the following information, found in Summary of Tariff Information, 1929, Volume 2, page 2471:

* * * In that case [*New England Fish Co.* v. *United States, supra*] fish caught by Americans in American vessels were bought by a Canadian subsidiary of an American corporation, landed, graded, and packed in ice in Canada and immediately shipped in bond in sealed cars to the American corporation without having paid Canadian duty or entered Canadian commerce. They were held entitled to free entry under paragraph 1630 as products of American fisheries. In other decisions, fish caught by crews of vessels of American registry, commanded by American masters, and furnished with American gear, when purchased by an American corporation and landed at a Canadian port, where they were frozen and stored, remaining at all times the property and under the control of the

American corporation, were held to be entitled to free entry when brought to the United States. * * *

With this information before the Congress it enacted paragraph 1730, the material parts of which follow:

PAR. 1730. (a) All products of American fisheries (including fish, shellfish, and other marine animals, and spermaceti, whale, fish, and other marine animal oils), which have not been landed in a foreign country or which, if so landed, have been landed solely for transshipment without change in condition: *Provided*, That fish the product of American fisheries (except cod, haddock, hake, pollock, cusk, mackerel, and swordfish) landed in a foreign country and there not further advanced than beheaded, eviscerated, packed in ice, frozen, and with fins removed, shall be exempt from duty: *Provided further*, That products of American fisheries, prepared or preserved by an American fishery, on the treaty coasts of Newfoundland, Magdalen Islands, and Labrador, as such coasts are defined in the Convention of 1818 between the United States and Great Britain, shall be exempt from duty.

\* \* \* \* \* \* \*

When the House committee made its report, in explaining what it had done with reference to the fish question, it said in part:

Paragraphs 717 to 721 relating to fish and fish products have been entirely rewritten *to meet the modern commercial practices and to correspond with decisions made by the customs officials and the courts.* * * * [Italics ours]

With reference to paragraph 1732 it said:

Paragraph 1732: This paragraph has been rewritten and, as it now reads, will permit the fishermen on the Pacific coast to land their fish at Prince Rupert, where they may be beheaded, eviscerated, packed in ice or frozen, and brought into this country duty free, but the products of the American fisheries on the Atlantic coast, namely, cod, haddock, hake, pollock, cusk, mackerel, and swordfish, are excepted from this provision but can come in duty free when they are landed in a foreign country solely for the purpose of transshipment without change in condition.

In view of what information was before Congress and especially the decision of this court in the *New England Fish Co.* case, *supra*, where the sole issue was whether or not the goods had been sold to Canadians and therefore entered the commerce of Canada, and in view of what the report of the committee states, there is certainly no justification for holding that Congress not only intended the law "to meet the modern commercial practices and to correspond with decisions made by the customs officials and the courts," but that it intended to go so far as to permit free entry of fish which had gone into the commerce of the foreign country and then reached the United States. It is a strained construction of paragraph 1730 to hold that the provision "landed solely for transshipment" does not apply to the instant merchandise. It of course applies. The plain import of it is that with the exception of certain kinds of fish which may be beheaded, eviscerated, packed in ice, frozen, and with fins removed, no fish which are landed for any other purpose than transportation shall have a free status.

The American fishing vessel owners landing fish at Prince Rupert, British Columbia, made it plain to the committees of Congress, concerned with the preparation of the involved fish provision, why they wanted the American fisheries paragraph written so as to retain the privilege they were entitled to under the decision in the *New England Fish Co.* case, *supra*. See Tariff Readjustment—1929, Hearings before the Committee on Ways and Means, House of Representatives, Vol. XV, p. 8998. It was represented to Congress that certain interests in Alaska were attempting to make American caught fish dutiable unless landed in Alaska. They furthermore stated that most of the halibut, the principal food fish shipped to the United States from Prince Rupert, was bought by American interests. Canadians, it was said, buy some of them. If fish caught by Americans are sold to Canadians who for themselves advance them within the terms of the *proviso* and ship them to America free of duty, it would do a great injustice to American companies dealing in American caught fish.

In the light of all the circumstances heretofore referred to, it would seem to conclusively appear that it was never the legislative intent to permit American caught fish to be purchased by foreigners, become a part of the commerce of the foreign nation, and then be free of duty in the United States if they had by them been advanced within the terms of the *proviso*, and any decision by this court that may be interpreted by foreign fishing industries as being a holding that American caught fish may pass into foreign hands and into foreign commerce and be free of duty as long as they are not advanced further than as specified in the *proviso* will naturally lead to a result which Congress simply could not have contemplated.

It must be remembered that the provisions under consideration here had their genesis in the wish to protect the American fishing industries which include Americans who buy, sort, ice and transport to the United States fish caught under the American flag, as well as the interests of those who actually catch them. Not only was the decision of this court and the rights it assured to American fishing interests called to the attention of Congress by interested parties and the Tariff Commission, but the committee report showed that these considerations were one of the moving causes of the rewriting of the various fish provisions.

As I interpret paragraph 1730, which is inartfully drawn and evidently was amended piecemeal in the committee as well as in the Senate, it provides first, for products of American fisheries, including a number of things with which we are not here concerned, but which have not been landed in a foreign country; second, it provides that if such products have been so landed they shall be landed solely for transshipment without change in condition; third, that *fish* products of such fisheries (except New England fish specifically named), if

landed in a foreign country for no other purpose than for transportation except to have them beheaded, eviscerated, frozen, with fins removed, shall be free; fourth, it provides for free entry of prepared or preserved products of American fisheries which are prepared by American fishing interests under certain treaty rights.

It is my view that to interpret the statute as the majority have done entirely emasculates it. The *proviso* with which we are concerned merely makes an exception to the mandate that the fish may not be landed except for transshipment and this exception relates entirely to the advancement of the fish and not to any other purpose for which the fish might have been landed. In the instant case the fish were not only landed for the purpose of advancement within the *proviso* but they were landed under the requirements of a clearly worded decree of Mexico that needs no interpretation. It plainly says, according to the translation, Exhibit No. 5, found in the record:

I. It may only be conceded [fishing zone] to the Cooperative Society of Fishermen which may be organized with regional fishermen under the concept that those who may desire it, nationals or aliens, may be admitted as members, provided that its integral production be delivered for its sale, whether for the interior consumption of the Republic or for exportation, through the said Cooperative.

It is thus seen that the decree of Mexico specifically provides that they must be delivered for sale for interior consumption as well as for exportation. In the record is a bill of sale by the Cooperativa setting out the price which the Sonora Fish Co. paid to the Cooperativa. The fish were required to be landed in Mexico and turned over to the Cooperativa for purposes other than transportation and for advancement within the terms of the *proviso* in that the record shows that dues amount to 1 centavo per kilo of the fish caught were required to be paid and they couldn't be imposed unless the fish were landed. They were landed, therefore, for the purpose of making them subject to Mexican control, Mexican resale, and Mexican charges. In my view it makes little difference whether it be held that title had actually passed from the American under whose direction the fish were caught to the Cooperativa as long as the fish were landed for some purpose other than transportation or advancement within the terms of the *proviso*.

It seems clear to me that if fish which have entered foreign commerce were not regarded as *products of American fisheries* for free list purposes under the Tariff Act of 1922, there is nothing in the Tariff Act of 1930 which warrants a change in their classification.

It is my view that the judgment of the trial court should be reversed.